OMAHA & REPUBLICAN VALLEY RAILWAY COMPANY
v. BERNARD CLARK.

[FILED DECEMBER 20, 1892.]

1. **Railroad Companies:** NEGLIGENCE: NEEDLESSLY ALLOWING
STEAM TO ESCAPE: PLEADING. In an action against a railway
company for negligently, wrongfully, and unlawfully blowing
off steam from its engine whereby the plaintiff's horses were
frightened and ran away, breaking his leg, etc., *held,* that the
words employed implied that steam was blown off needlessly
and unnecessarily, and as no objection had been made to the
petition by demurrer, it was sufficient after verdict.

2. ———: ———: ———: Injuries from Frightening of Horses. A railway company in the legitimate transaction of its business has the right to use steam and is not liable for the proper and necessary use of the same, even if it result in injury to others as by frightening horses and causing them to run away. If, however, an engineer within a city, where teams are constantly passing, needlessly and unnecessarily opens the valves of his engi e and frightens such horses and causes them to run away and commit injury, the company will be liable, provided the plaintiff is free from contributory negligence.

3. Evidence: Question for Jury. There being testimony which would warrant the jury in finding a verdict against the defendant, it was properly submitted to them, and the court did not err in refusing to direct a verdict for the defendant.

Error to the district court for Madison county. Tried below before Norris, J.

*John M. Thurston*, *W. R. Kelly*, and *E. P. Smith*, for plaintiff in error.

*E. P. Wigton* and *E. F. Gray*, contra.

Maxwell, Ch. J.

This action was brought by the defendant in error against the plaintiff in error to recover for personal injuries, and on the trial the jury returned a verdict in his favor for the sum of $4,835, upon which judgment was rendered. The questions presented are, many of them, new in this court. The cause of action is set forth in the petition as follows:

"That at the time of the committing of the wrongs and injuries hereinafter complained of, the said defendant was, and still is, a corporation duly incorporated and organized under and pursuant to the laws of the state of Nebraska; and then and ever since owned and operated with its locomotives and cars a railroad leading from Columbus, in Platte county, Nebraska, to and through the city of Norfolk, in Madison county, Nebraska; that at said time of the commit-

ting of the wrongs and injuries hereinafter mentioned said city of Norfolk was a city of the second class, compactly built up, of the population of 5,000 inhabitants, and then had and long prior and ever since has had, a street named Norfolk avenue, and also called Main street, passing through said city in its most central and business portion, and running east and west, which said street then was, and had been, and still is, the principal street, roadway, and thoroughfare of said city; that at said time of the committing of the wrongs and injuries hereinafter complained of, the defendant's said railroad and its side tracks crossed the said principal stree., roadway, and thoroughfare in the central and most public business portion of said city, running north and south; that at said time of the committing of the wrongs and injuries hereinafter complained of, the said defendant, by its servants and agents, negligently, wrongfully, and unlawfully stopped, left, and permitted its locomotive engines to stand and remain headed south for a long time, viz., for the space of twenty minutes, on its side track, at the north margin of said principal street, at the point of the said crossing of the same by said railroad and side tracks, and at the same time negligently, wrongfully, and unlawfully omitted and neglected to have at said crossing any flagman or person to give warning; that on the 13th day of August, 1888, the said plaintiff was engaged in hauling dirt with his team of horses and wagon upon said principal street, roadway, and thoroughfare, in said city, to grade the same and other streets, and necessarily had to pass and repass over the said crossing of the same by said railroad and side tracks with his said team and wagon, and having unloaded his said wagon of dirt in one of the said streets, and the plaintiff then standing upon the dirt bed or planking floor of his wagon necessarily, without any negligence, wrong, default, or want of due care on his part, drove his said team of horses and wagon west in the center of said principal street, roadway, and thoroughfare to pass over said cross-

ing, when, as plaintiff had so driven his team upon said crossing, in the center of said principal street, in front of said locomotive engine and about fifty feet from it, so left standing as aforesaid, the said defendant, by its servants in charge of its said locomotive engine, negligently, wrongfully, and unlawfully, suddenly, and without warning to the plaintiff, let off and discharged steam from said locomotive engine and from the cylinders thereof in great volume, noise, and hissing sound, by means of which, and the several negligent, wrongful, and unlawful acts, omissions, and defaults of the defendant, its servants and agents, above stated, the said team of horses took fright, became unmanageable, ran away, and threw the plaintiff off from his said wagon, down under the same, and ran said wagon and the wheels thereof over him, whereby he was greatly injured, his right leg between the knee and ankle was crushed and both bones thereof broken in several places and mashed into several pieces, the thigh of the same leg was bruised and injured, his left leg and thigh and ankle were bruised and injured, his head was cut and bruised, and he was otherwise bruised and injured, from which injuries he became and was, from thence hitherto, sick, sore, and crippled and unable to carry on his usual work and business, and from which injuries he has from thence hitherto suffered great pain and anguish, and from which injuries he is permanently crippled and injured, and will continue to suffer pain and anguish for the remainder of his life; and that he has necessarily incurred, expended, and paid out for surgical and medical attendance, medicine, and nursing in endeavoring to be cured of said injuries the amount of $325, and that the plaintiff's entire damages in the premises are $10,000."

To this petition the railway company made answer, in substance, denying that its employes wrongfully, negligently, and unlawfully permitted its engine to stand on the track at the point indicated or that there was no watchman at the crossing named; denies that the plaintiff was driving

in the streets and that the locomotive in question suddenly, without warning, let off steam from the cylinders, with other special denials which need not be noticed. It will thus be seen that the question of negligence of the company and the contributory negligence of the plaintiff below were fairly presented to the jury.

It is insisted with great earnestness on behalf of the plaintiff in error that the petition fails to allege actionable negligence, and we are referred to the case of *A. & N. R. Co. v. Loree*, 4 Neb., 446. In that case it was held, in effect, that there was a failure to allege that the arrangement of material on the cars was unusual and unnecesary in the legitimate transaction of the business of the company. It was also held, in effect, that the words " scare crow," "horrid," and "frightful appearance," without stating in what respect, were not sufficient to raise an issue, and therefore, taking the whole petition together, it failed to state any dereliction of duty on the part of the company, and in our view the decision is correct. The petition in this case, however, charges that the railway crosses one of the principal streets of the city; that no flagman was placed there; that the plaintiff below, without notice or knowledge of the presence of the engine, drove to the center of the street to pass over the railway and about fifty feet in front of a locomotive when the person in charge thereof "negligently, wrongfully, and unlawfully, suddenly, and without warning to the plaintiff, let off and discharged steam from said locomotive engine and from the cylinders thereof in great volume, noise, and hissing sound," etc., by means whereof his horses were frightened and ran away. If steam was blown off "negligently, wrongfully, and unlawfully," then it was unnecessary, and in violation of its duty. Had any question been raised upon the petition a demurrer should have been interposed and its legal effect determined before going to trial. This was not done, but its sufficiency in effect conceded; and liberally construed, it states a cause of

action. In saying this we are not to be understood as deciding that where the cylinder cocks are opened and steam necessarily blown off and horses frightened thereby that the company is liable for the damages. (*Hahn v. Southern P. R. Co.*, 51 Cal., 605; *Beatty v. Cent. I. R. Co.*, 58 Ia., 242; *Abbot v. Kalbus*, 43 N. W. Rep. [Wis.], 367. In the case last cited it is said, in effect, that the evidence did not show that the locomotive made any other than the usual noises, and all the cases cited by the plaintiff in error are to the same effect. But it is said that even if the law is as contended by the defendant in error, still there is no evidence in support of the charge.

One George R. Latimer, a civil engineer, called as a witness by the plaintiff below, testified that he was about 600 feet away from the engine at the time of the occurrence; that his attention was called to the scene of the accident by the escape of steam.

Q. You may state what attracted your attention and what you saw.

A. Well, I think there were several of us there together and a remark something like this was made—I think that the remark was made by some of us—that that engine was making an unusual amount of noise; that was about the remark.

Q. A remark was made by some one in regard to the engine?

A. Yes, sir.

Q. Did you look up then to see?

Q. What did you do when that remark was made?

A. I turned around and saw a team running away.

Q. You remember looking around and seeing a team running away; whose team was that?

A. I learned afterwards that it was Mr. Clark's team.

Q. Bernard Clark, the plaintiff?

A. Yes, sir.

Q. Did you see the man that was hurt?

A. Yes, sir.

Q. State whether or not he was the same man that was driving that team.

A. Yes, sir.

Q. Now you may state whether or not that was Bernard Clark, the plaintiff.

A. Yes, sir,

Q. It was?

A. Yes, sir.

Q. Now, as you looked up and saw this team running away, did you see an engine near to the team?

A. Yes, sir.

Q. Where, as you looked up, was the team and was the engine; where was the team, what part of the street, or that crossing, that railroad crossing?

A. Well, it was just near the crossing—just on the crossing, or coming to the crossing going west.

Q. Just on the crossing, or just coming to the crossing?

A. Yes, sir; the team.

Q. Now, where was the team with reference to the middle of the street?

A. It was very near the middle of the street.

Q. Now, where was this engine that you saw with reference to the team?

A. It was north of the street.

Q. Now, how near to the north—that street runs east and west?

A. Yes, sir.

Q. And the railroad tracks run north and south, or nearly so?

A. Yes, sir.

Q. Now, where was the engine with reference to the north margin of the street?

A. Well, it was very close; it was not very far away; it was not very far from the street.

On the cross-examination he testified:

Q. Which direction was you looking at that particular time?

A. Well, my recollection is that I was facing a little bit northwest.

Q. Well, now, what were you looking at at the time, or just before you heard the noise that you have testified to, and what were you doing?

A. I was looking at the winding up the tape.

Q. You was looking at the tape, was you not?

A. Yes, sir.

Q. Who was with you there?

A. I don't remember who the parties were?

Q. Do you remember who they were or how many there were?

A. I think that there were two.

Q. Well, now, what do you remember as to buildings on that side of the street where you were, between you and the Elkhorn Valley track and the U. P. tracks?

A. Well, my recollection is that there was this building that we have been speaking of—the Gravel grocery—that is my recollection of it.

Q. Do you remember of any other buildings along there?

A. I don't call to mind just now; there may have been a house.

Q. What grocery did you call that?

Q. I think it is called the Gravel grocery. There may have been a residence or two there also.

Q. Well, now, while you was winding up this tape and paying attention to the tape, what was it that first called your attention to the runaway team?

A. Well, I think it was the noise of the steam that I heard.

Q. Well, now, did you hear steam any more after you observed the runaway?

A. I don't remember of hearing any noise after the

team was excited at that time that I looked around and saw both of them.

Q. You was in the habit of passing up and down that street frequently?

A. Yes, sir.

Q. And was in the habit of seeing trains and engines passing over this particular street?

A. Yes, sir.

Q. As you came to and from your place of residence?

A. Yes, sir.

Q. Had you not frequently heard these engines letting off steam and making a noise?

A. Yes, sir.

Q. Was there anything particular about this noise which called your attention more than any ordinary noise that happens as you go up and down that street when you have heard other engines letting off steam?

A. I presume, probably, that I have heard the noise before and since.

M. Phillips, a carpenter, testifies that he was at work on the roof of a story and a half building, about one block from the engine at the time of the accident, and saw what transpired.

Q. You may state what you saw and heard with reference to the engine at the time that you saw the team.

A. Well, I heard an unusual amount of steam, that is what attracted my attention, that is the reason that I looked that way and at the same time I saw the team.

Q. State whether you saw the team or not.

A. Yes, sir.

Q. Where did the steam escape from?

A. I think that the engine was going off at the time and also escaping from the cylinder cocks.

Q. In referring to the cylinder cocks, what part of the engine do you refer to.

A. The steam chest.

Q. You mean down on the sides of the engine?

A. Yes, sir.

Q. Whereabouts is that with reference to the front trucks?

A. It is right over the front trucks.

Q. And about how high up are these steam cylinders?

A. Just about a couple of feet.

Q. What kind of a sound was this escaping steam?

A. It was a hissing sound, the same as steam escaping.

Q. Now, what was it that first attracted your attention and caused you to look that way?

A. It was the noise of the steam.

Q. When you first looked up, on your attention being so attracted, was that the time that you spoke of as first seeing the steam?

A. Yes, sir.

Q. After you first looked up and first saw the team what was the team doing then, where were they? Just state what the team was doing, and what the driver was doing; state all the facts as you first looked up.

A. Well, the team was running, it had started to run; it was under pretty good headway.

Q. Did you notice it when it had started to run?

A. No, sir; I did not.

Q. It was running when you looked up and saw it?

A. Yes, sir.

Q. State whether it went faster after you first looked up?

A. Yes, sir; it went faster afterwards.

Q. Well, now, about the driver, did you notice that he was holding onto the lines when you first looked up?

A. Yes, sir; he was on the wagon holding onto the lines.

Q. Did you notice his position on the wagon?

A. I think he was sitting down.

Q. When you first looked up and saw the team, as you spoke of a little while ago, what was its position; I want to locate its position when you first looked up and saw the

team, where was it with reference to the front of the engine?

A. It was between me and the engine and a little west.

Q. Of what?

A. When I first looked up to see it was a little bit west of the engine, probably the length of the wagon west of the engine.

Q. It was a length of the wagon west of the engine then?

A. Yes, sir, when I first noticed it.

Q. How long did that engine keep letting off steam from the cylinder cocks, so far as you noticed it, at that time?

A. I did not pay any more attention to the engine; I kept my eye on the team while after they passed by where I was at work.

Q. Did you notice by hearing or seeing whether the steam kept on blowing or let up?

A. I could not say about that.

The plaintiff below testifies:

A. I drove carefully up to within about 100 feet of the crossing, then I tightened on the lines and braced myself up, I did not know but what the engine might move, and I prepared myself for any emergency that might take place the best I could.

Q. Did you still remain standing—was you standing?

A. Yes, sir.

Q. That was within about 100 feet of the crossing.

A. Yes, sir.

Q. What occurred then?

A. I went on slowly; I could not tell whether I was trotting or walking; I could not tell which; as I was on the crossing and entering on the track in front of the engine, the engine blew off steam, a loud hissing noise.

Q. At that time was you still standing up?

A. When the engine blew off steam and the team jumped I sat down on the wagon and pulled on the lines.

Q. How did you sit down?

A. Well in pulling on the lines, I sat down quietly.

Q. Stand up and just show us how you pulled on the lines and sat down.

A. Pulled that way and sat down (witness showing the jury how he did).

Q. Steadied yourself with the lines?

A. Yes, sir.

Q. You held the lines as tight as you could; your feet were towards the horses?

A. Yes, sir; towards the horses.

Q. Just tell us again what point you were at when the team took fright and jumped, with reference to the front of the engine.

A. I said that I was entering on the railroad or railway just entering on it, my team was just entering the railroad track that the engine was on.

Q. When the team jumped?

A. Yes, sir.

Q. Had you got on past the engine when they first jumped?

A. The team was entering the track that the engine was on at the time the noise was made from the engine.

Q. Now, this noise from the engine; state the appearance of any steam that you saw or heard.

A. I did not see any steam; I heard a loud hissing, continuous blowing off of steam.

Q. You say that you did not see it?

A. No, sir.

Q. Did you have time to look at it?

A. No, sir.

Q. What did you say that the sound was?

A. It was a hissing sound.

Q. Now state, with reference to the time the team started to run, whether the steam escaped just before or after.

Q. State when you heard the hissing sound with reference to the time that the horses started.

A. Why the horses started when they heard the noise of the steam—not until then.

There is considerable other testimony to the same effect. Some of the witnesses on behalf of the company testify that the noise was made by the escape from the pop valve over which the engineer had no direct control. The question thus became proper to submit to a jury, and under the state of proof in this case the court will not disturb their findings.

It is unnecessary to review the instructions at length. The principal contention of the plaintiff in error is that there is no liability shown, and in effect that the jury should have been so instructed; but in our view the court below did right in submitting the questions to the jury. The questions of fact seem to have been fairly submitted. That a railway company, when necessary in operating its road, may blow off steam in the crowded thoroughfare of a city as well as other places is undoubted, even if by doing so horses will be frightened and losses thereby sustained, but it has no right to do so wantonly or when unnecessary to do so. While the rights of the company are to be respected and protected, other persons also have rights which in like manner must be respected by the company and its employes. The right of the public to use the streets of the city are equally as broad as the right of the company to use its tracks, and neither can willfully commit an injury whereby loss is sustained by the other without liability.

The case of *Andrews v. Mason, etc., Ry. Co.*, 42 N. W. Rep. [Ia.], 513, is very similar in its facts to this case, and it was held that the company was liable. In that case the plaintiff's team was frightened by the discharge of steam and ran away and committed injury for which the plaintiff was permitted to recover. The same rule was applied in *Man-*

O. & R. V. R. Co. v. Clark.

*chester,* etc., *Ry. Co. v. Fullarton,* 14 C. B., n. s. [Eng.], 53; *Toledo, etc. Ry. Co., v. Harmon,* 47 Ill., 298; *Nashville, etc., Ry. Co. v. Starnes,* 9 Heisk. [Tenn.], 52, and is approved by Judge Thompson in his valuable work on Negligence, vol. 1, pp. 351, 352. He says: "Whilst no liability attaches for damages arising from the doing of these acts under proper circumstances, yet it will be different if they are done without necessity, negligently, or wantonly. For although, as will be shown in a subsequent chapter, the rule obtains in England, and generally in this country, that a master is not answerable in damages for the wanton and malicious acts of his servant, yet enlightened American courts have refused, on cogent grounds of public policy, to extend this immunity to railway corporations whose servants are entrusted with such extensive means of doing mischief. Accordingly it has been held that if such a servant, while in charge of the company's engines and machinery, and engaged about its business, willfully perverts such agencies to purposes of wanton mischief the company must respond in damages. This doctrine has been applied where the person in charge of a railway locomotive frightened a traveler's horse by blowing off steam and sounding the steam whistle with a loud noise when it was wholly unnecessary." This, we think, is a correct statement of the law. Upon the whole case the questions were proper to submit to a jury and there is no material error in the record and the judgment is

AFFIRMED.

THE other judges concur.